**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DERRICK RILEY, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br> v.<br><br>HUEL INC.,<br><br>    Defendant. | **CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL**<br><br>Case No. 25-cv-5783 |

  Plaintiff Derrick Riley, on behalf of himself and all others similarly situated, bring this class action suit for damages and equitable relief against Huel, Inc. ("Huel" or Defendant"). Plaintiff alleges the following based upon personal information as to allegations regarding himself, and the investigation of his counsel, and on information and belief as to all other allegations:

## FACTUAL ALLEGATIONS

1.    Defendant manufactures, markets, and distributes a range of dietary supplements, snacks, and meals, which it markets as "Fast, nutritious, *complete* food." At issue in this complaint is Defendant's Huel Black Edition Powder (the "Product"), which, it sells as a "High-protein complete meal."



2.    According to Defendant, the Product "is a nutritionally complete powdered food that is high in protein and fiber, reduced carbohydrate, and rich in healthy fats."[1] Defendant claims that the Product "works to meet the HHS and USDA's Dietary Guidelines and Daily Value (DV) requirements for all macro- and micronutrients, and proportion them to provide what you need from a meal."

3.    Defendant also contends it has "Food Safety and Quality Controls" and states that "Here at Huel, excellent nutrition and health are key, so we have listed some of the information that confirms this commitment to health and safety throughout all aspects of Huel."[2]

4.    It specifically represents as to heavy metals, including "arsenic, cadmium, lead, and mercury," that:

> The long-term ingestion of heavy metals has been shown to have harmful effects. As heavy metals are naturally found in the environment (e.g. in water, soil, and the air) they can accumulate in foods. However, the levels of contamination may also be increased through human activities such as farming, ingredient and processing, and storage.
>
> Numerous studies have been undertaken to identify safe consumption levels, and at Huel we work to recommended levels as outlined by the European Food Safety Authority (EFSA) where available; . . .

5.    And Defendant promises: "We periodically test products to identify heavy metal levels and to measure them against the recommended intake levels. We

---

[1] https://huel.com/pages/the-huel-black-edition-formula-explained

[2] https://huel.com/pages/huel-food-safety-and-quality-controls

also visit our suppliers so that we can understand where our ingredients come from as part of our procurement procedure."

6.    However, despite Defendant's representations to the contrary, Defendant's Product contains elevated levels of heavy metals.

7.    In fact, Defendant deceptively marketed and labeled the Product as safe while concealing and failing to disclose that the Product contain dangerous concentrations of lead—a known neurotoxin with no safe level of human exposure— and cadmium, another dangerous heavy metal.

8.    According to investigative reporting by Consumer Reports,[3] just one serving of the Product was found to contain 6.3 micrograms of lead, which is about **1,290 percent** of Consumer Reports' recommended daily lead limit. As a result, Consumer Reports recommends consumers do not consume the Product at all, and that it is a "Product[] to Avoid":

---

[3] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/?EXTKEY=M5ANXO



9.    Just one daily serving of the Product would cause someone to exceed the

daily FDA interim reference level of lead. As Consumer Reports explains:

> The FDA has set "interim reference levels"—these are estimates, not regulations or action levels, designed to protect against lead toxicity—for children and women of childbearing age. Those levels are currently 2.2 micrograms and 8.8 micrograms per day, respectively. An FDA spokesperson told CR there is sufficient evidence that the 8.8 micrograms per day benchmark should be applied to all adults.

> The average American adult is exposed to up to 5.3 micrograms of lead each day through their diet, according to a 2019 analysis published by scientists at the FDA. For comparison, one serving of Naked Nutrition's Mass Gainer contained 7.7 micrograms of lead, and a single serving of Huel's Black Edition contained 6.3 micrograms. That means someone taking a single serving of one of these

supplements daily is likely exceeding the FDA's interim reference level for dietary lead.

10.    In addition, the Product was found to contain 9.2 micrograms of cadmium, which Consumer Reports note is "more than double the level that public health authorities and CR's experts say may be harmful to have daily," which has the limit of 4.1 micrograms.

11.    Lead and cadmium are well-documented neurotoxins that pose serious risks to public health.

12.    The levels of lead and cadmium in the Product far exceed thresholds considered safe by public health experts, and pose significant risks to children, adults, and pregnant individuals. Yet nowhere in advertising or the Product's packaging does Defendant inform their customers of such heavy metal content.

13.    Exposure to lead causes irreversible harm. It impairs cognitive development, reduces IQ, causes behavioral disorders and learning disabilities in children, and increases the risk of miscarriage, premature birth, and long-term cardiovascular, renal, and neurological conditions in adults. The Centers for Disease Control and Prevention ("CDC"), the American Academy of Pediatrics ("AAP"), and the World Health Organization ("WHO") uniformly conclude that no amount of lead exposure is safe.

14.    Lead is a cumulative toxin in bones and soft tissues, where it continues to disrupt critical biological functions long after exposure. The risk intensifies with repeated or prolonged exposure. As the Mayo Clinic warns, "Signs and symptoms

usually don't appear until dangerous amounts have accumulated."[4] The CDC also states, "The effects of lead poisoning can be permanent and disabling."[5]

15.    The WHO reports that "[l]ead exposure causes a significant burden of disease."[6] And according to the Environmental Protection Agency ("EPA"), ingesting lead can result in seizures, coma, and death.[7] Exposure to lead contributed to more than 1.5 million deaths in 2021.[8]

16.    Lead exposure also poses unique reproductive risks. It can impair fertility in those attempting to conceive and, during pregnancy, lead can cross the placenta and damage the developing fetus, increasing the risk of miscarriage, stillbirth, and lifelong developmental harm.[9]

17.    Consumers reasonably expect health supplements like the Product to be free of harmful heavy metals such as lead and cadmium. Had consumers known that the Product contained heavy metals, they would have paid significantly less—or not purchased the product at all.

18.    Yet, none of Defendant's marketing discloses that the Product contains lead or other heavy metals. No warnings appear on the packaging or ingredients list.

---

[4] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717

[5] https://www.cdc.gov/lead-prevention/about/index.html

[6] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

[7] https://www.epa.gov/lead/learn-about-lead

[8] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

[9] https://www.cdc.gov/lead-prevention/risk-factors/pregnancy.html

The omission of this critical fact misleads consumers and undermines their ability to make informed purchasing decisions.

19.    For instance, while acknowledging that "there is no known safe level of lead in a child's blood," the EPA's action level for lead in drinking water is 15 ppb.[10] Under the Lead and Copper Rule, if more than 10 percent of tap water samples from a public water system exceed this level, the system is required to take corrective actions.[11]

20.    Some public health authorities have adopted more protective standards. For example, New York State recently lowered the action level for lead in school drinking water from 15 ppb to 5 ppb.[12] When lead levels in school fixtures meet or exceed 5 ppb, schools must remove the fixture from service, provide free, alternate drinking water, notify the community, and take steps to remediate the issue.[13]

21.    There also is no known safe level of exposure cadmium.[14]

22.    Despite the well-known dangers of heavy metals and the heightened duty of care owed when marketing products, Defendant did not disclose the presence of lead and cadmium in the Product. Nor did they warn consumers about the risk of

---

[10] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water

[11] *Id.*

[12] The Product's tested concentration of lead is 6.3 micrograms per serving. *See above.* To reach that dose, a school child would need to drink 1.26 liters of water at the action level of 5 ppb of lead.

[13] https://www.nysed.gov/new-york-state-school-deaf/lead-testing-drinking-water

[14] *See* Transcript from Public Meeting, *Closer to Zero Action Plan: Impacts of Toxic Element Exposure and Nutrition at Different Crucial Developmental Stages for Babies and Young Children* (Nov. 18, 2021), https://www.fda.gov/media/155396/download?attachment

exposure to heavy metals. To the contrary, Defendant uniformly represented that its Product was safe, thoroughly tested, and free of harmful ingredients.

23.    Defendant knew, or should have known, the formulation of their Product, including the presence of heavy metals such as lead and cadmium. Despite their knowledge—or their duty to know—Defendant failed to test for or eliminate these dangerous contaminants. Instead, Defendant concealed the risk and continued to market the Product as safe. Defendant recklessly disregarded its duty to ensure the Product was manufactured safely, resulting in products tainted with toxic contaminants.

24.    As a result of Defendant's concealments and misrepresentations, consumers paid a price premium for contaminated products. The Product is worth far less—or nothing at all—because it contains known neurotoxins. Plaintiff and Class members suffered real economic harm.

25.    Defendant's omissions and misrepresentations deprived consumers of the ability to make informed decisions and induced them to pay a price premium for a product that is, in fact, worth significantly less—or nothing at all.

26.    Accordingly, Plaintiff seeks monetary and injunctive relief against Defendant under New York General Business Law ("GBL") §§ 349 & 350 on behalf of a proposed Nationwide class, and in the alternative, under California consumer protection law on behalf of a proposed California Subclass.

**THE PARTIES**

27.    Plaintiff Derrick Riley is a California resident. He has purchased the Product dozens of times. Had Plaintiff known the truth about the Product's heavy

metal content, he would not have purchased any of the Product or otherwise would have paid less for it.

28.     Defendant Huel Inc. is a Delaware company, and the headquarters of its U.S. operations is in Brooklyn, New York.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 class members are involved; and many members of the proposed Classes are citizens of different states than the Defendant.

30.     This Court has personal jurisdiction over Defendant because its main U.S. office is in Brooklyn, New York, and because Defendant committed the tortious acts alleged herein in New York, regularly conducts business in this District, and has extensive contacts with this forum.

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant transacts substantial business in this District.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action on behalf of himself and on behalf of the following proposed Nationwide Class, initially defined as follows:

> All individuals in the United States who purchased the Product within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

33.    Plaintiff also brings this action on behalf of himself and on behalf of the following proposed California Subclass, initially defined as follows:

> All individuals in California who purchased the Product within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

34.    Excluded from the proposed Classes are Defendant, its, parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest.

35.    Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

36.    The claims of all class members derive directly from a single course of conduct by the Defendant. Defendant has engaged and continues to engage in uniform and standardized conduct toward the putative class members. Defendant does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual class members.

37.    Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

38.    Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

39.     Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

40.     **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are each so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed each Class includes many tens of thousands of members. The precise number of class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Defendant's records.

41.     **Ascertainability.** The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Defendant in the usual course of business and within their control or Plaintiff and the Classes themselves. Plaintiff anticipates providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

42.     **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

(a) Whether Defendant engaged in the conduct alleged in this Complaint;

(b) Whether Defendant violated the applicable statutes alleged herein;

(c) Whether Plaintiff and the class members are injured and harmed directly by Defendant's conduct;

(d) Whether Plaintiff and the class members are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts; and

(e) Whether Plaintiff and the class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint

(f)     whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

(g)     whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(h)     whether Plaintiff and the Classes are entitled to civil penalties;

(i)     whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

43.     **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of Plaintiff and the putative class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendant, resulting in the same injury to Plaintiff and the putative class members. Plaintiff and all class members are similarly affected by Defendant's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic

to, those of the other class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

44.    **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the class members, and he has retained counsel competent and experienced in complex class action, business competition, health care and consumer litigation. Plaintiff and his counsel will fairly and adequately protect the interest of the class members.

45.    **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the tens or even hundreds of thousands of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

46.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(a)    the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendant; or

(b)    the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)    Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff and the Nationwide)

47.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

48.    NY GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

49.    NY GBL § 349 applies to Plaintiff and the Nationwide Class because the State of New York has an interest in regulating business conduct in the region. Defendant's US-based operations emanate from its Brooklyn office and its terms of service—to which Plaintiff did not have notice nor assent to—are governed by New York law and mandate that any claim brought be in courts in New York, New York.

50.    Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that the Defendant willfully or knowingly violated this section. The court may award reasonable attorneys' fees to a prevailing plaintiff.

51.    Defendant's marketing and promotion of the Product constitute materially misleading and deceptive business practices within the meaning of § 349.

Defendant failed to disclose the presence of heavy metals—specifically, lead and cadmium—despite representing the Product as safe, clean, appropriate for daily use,

52.     These representations were false and misleading. Defendant deceptively omitted that the Product contained dangerous heavy metals.

53.     By concealing these material facts and affirmatively representing the Product as safe and high-quality, Defendant misled consumers into believing the Product was free from harmful contaminants. A reasonable consumer would find the presence or risk of heavy metals in the Product highly material to their purchasing decision.

54.     Plaintiff and the Nationwide Class reasonably relied on Defendant's omissions and representations in purchasing the Product. They were led to believe the Product was free from harmful substances and safe for regular use. Defendant failed to disclose the presence or risk of heavy metal contamination, a fact that would have been material to any reasonable consumer.

55.     Plaintiff and the Nationwide Class never received the benefit of their bargain. They paid a price premium for products falsely marketed as clean, non-toxic, and safe, when in fact they contained elevated levels of dangerous contaminants.

56.     Defendant's false and misleading statements emanated from New York. Defendant knew, or by the exercise of reasonable care should have known, that its statements are untrue and misleading to consumers, including Plaintiff and the Nationwide Class.

57.     Plaintiff and the Nationwide Class have been injured by Defendant's deceptive acts or practice, suffering an ascertainable loss by paying more for products than they otherwise would have but for the false advertising.

58.     Plaintiff and the Nationwide Class have no adequate remedy at law.

59.     Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Nationwide Class and will continue to damage both Plaintiff and the Nationwide Class and deceive the public unless enjoined by this Court.

## SECOND CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 350
### (On Behalf of Plaintiff and the Nationwide)

60.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

61.     By reason of the acts set forth above, Defendant has been and is engaged in consumer-oriented advertising and marketing against Plaintiff and the Nationwide Class, engaging in business conduct that is false and misleading in material respects, in violation of NY GBL § 350, which provides, in part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

62.     Defendant caused statements that were untrue or misleading, and which it knew to be untrue or misleading, to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications.

63.     Defendant's misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to Defendant's material misrepresentations.

64.     Plaintiff and the Nationwide Class have been injured by Defendant's deceptive acts or practices.

65.     Plaintiff and the Nationwide Class have no adequate remedy at law.

66.     Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Nationwide Class and will continue to damage both Plaintiff and the Nationwide Class and deceive the public unless enjoined by this Court.

67.     Pursuant to NY GBL § 350-e, Plaintiff and the Nationwide Class seek monetary damages (including actual damages or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL § 350-a(1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

68.     Defendant's conduct has also substantially injured the public, as consumers across New York were exposed to and relied upon Defendant's advertising while unaware of material omissions—specifically, the failure to disclose that the Product contained or had a material risk of containing lead and cadmium. Defendant's omission of this critical safety information deprived consumers of the ability to make informed purchasing decisions and created a false impression that the Product was clean, safe, and suitable for families and children. This deception not

only caused economic harm but undermined public trust in products that claim to be safe for everyday use.

69.     Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

### THIRD CAUSE OF ACTION

### Unjust Enrichment
### (On Behalf of Plaintiff and All Classes)

70.     Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

71.     Plaintiff and the Classes conferred a benefit on Defendant in the form of payments for the Product.

72.     Defendant accepted and retained these payments, even though it misrepresented the safety of the Product. Defendant's retention of this benefit is unjust because they knowingly marketed and sold a product containing unsafe levels of lead, while expressly representing that the Product was clean, non-toxic, and safe for daily use, and Defendant's representations were made without substantiation and in violation of the law.

73.     It would be unfair for Defendant to keep the money spent without compensating Plaintiff and the Classes because Defendant misled consumers into believing the Product was safe, when in fact it was not.

74.     Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the class members and will continue to both damage Plaintiff and the class members and deceive the public unless enjoined by this Court.

## FOURTH CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")
### California Business & Professional Code § 17200 et seq.
### (On Behalf of Plaintiff and the California Subclass)

75.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth here.

76.     The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

77.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

78.     A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

79.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

80.     Defendant has violated the "unlawful" prong under the UCL and has engaged in "unfair, deceptive, untrue or misleading" advertising.

81.     As further detailed in the below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code § 1770(a)(9).

82.     Defendant has also violated the "unfair" prong of the UCL by falsely representing that its Product was healthy while failing to disclose the presence of heavy metals.

83.     The gravity of the harm to Plaintiff and members of the California Class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendant may have had for engaging in such deceptive acts and practices.

84.     Defendant's acts and practices deceived Plaintiff and the California Subclass at large. Specifically, Plaintiff and the California Subclass relied on these misleading and deceptive representations.

85.     As a result of these violations under each of the unlawful, unfair, and fraudulent prongs of the UCL, Defendant has been unjustly enriched at the expense of Plaintiff and members of the proposed California subclass. Specifically, Defendant has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading, and deceptive conduct.

86.     Through its unfair acts and practices, Defendant has unlawfully taken money from Plaintiff and the class members. Plaintiff therefore requests that this Court order Defendant to restore this money to Plaintiff and all class members. Plaintiff further seeks an award of attorney's fees and costs under Cal. Code Civ. Proc. § 1021.5

87.     Plaintiff and the class members also lack an adequate remedy at law for future harm and seek to enjoin Defendant from continuing to violate the UCL, and/or

from violating the UCL in the future. Otherwise, Plaintiff, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

88. **Permanent public injunctive relief.** Plaintiff, acting as a private attorney general, also seeks public injunctive relief to protect the general public from Defendant's conduct.

89. Defendant's false advertising is ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff seeks a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein.

## FIFTH CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")
### California Business & Professional Code § 17500 *et seq.*
### (On Behalf of Plaintiff and the California Subclass)

90. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth here.

91. The FAL prohibits unfair, deceptive, untrue, or misleading advertising,

92. Defendant's acts and practices deceived Plaintiff and the California Subclass at large. Plaintiff and the California Subclass relied on these misleading and deceptive representations.

93. Through its unfair acts and practices, Defendant has unlawfully obtained money from Plaintiff and the class members. As such, Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and all class members.

Plaintiff further seeks an award of attorney's fees and costs under Cal. Code Civ. Proc. § 1021.5.

94.    Plaintiff and the class members also lack an adequate remedy at law for future harm and seek to enjoin Defendant from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiff, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

95.    **Permanent public injunctive relief**. Plaintiff, acting as a private attorney general, also seeks public injunctive relief to protect the general public from Defendant's conduct. Defendant's false advertising is ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff seeks a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein.

**SIXTH CAUSE OF ACTION**

**Violations of Consumers Legal Remedies Act (the "CLRA")
California Civil Code § 1750, *et seq.*
(On Behalf of Plaintiff and the California Subclass)**

96.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth here.

97.    Plaintiff and other class members are consumers within the meaning of Cal. Civ. Code § 1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

98.     Defendant is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§ 1761(b) and 1770.

99.     Defendant's Product is a "good" or "service" within the meaning of Cal. Civ. Code. §§ 1761(a) and (b).

100.    Defendant has violated § 1770(a)(5) by representing that the Product had characteristics it did not have.

101.    Defendant has violated § 1770(a)(7) by misrepresenting that the Product is of a particular standard, quality, or grade.

102.    Defendant has violated § 1770(a)(9) by advertising the Product with an intent not to sell them as advertised.

103.    Plaintiff and the other class members suffered actual damages as a direct and proximate result of Defendant's violation of the CLRA for conduct alleged herein.

104.    Plaintiff and the class members demand judgment against Defendant for injunctive relief and attorney's fees.

105.    **Permanent public injunctive relief.** Plaintiff, acting as a private attorney general, also seeks public injunctive relief to protect the general public from Defendant's conduct.

106.    Defendant's false advertising is ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff seeks a

permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, pray for relief and judgment against Defendant as follows:

A.    certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as Class Counsel;

B.    awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.    awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D.    awarding Plaintiff and the Classes exemplary and punitive damages;

E.    awarding Plaintiff and the Classes civil penalties;

F.    granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G.    enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

H.    awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I.    awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J.      awarding pre-judgment and post-judgment interest; and

K.      granting any other relief as this Court may deem just and proper.


## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 15, 2025

                                                Respectfully submitted,

                                                */s/ Raphael Janove*
                                                Raphael Janove
                                                **JANOVE PLLC**
                                                500 7th Ave., 8th Floor
                                                New York, NY 10018
                                                Tel: (646) 347-3940
                                                Email: raphael@janove.law